**Anthony BRUNO, Petitioner-Appellant,**

v.

**J. E. LaVALLEE, as Superintendent of Clinton Correctional Facility, Respondent-Appellee.**

**No. 1098, Docket 78–2032.**

United States Court of Appeals, Second Circuit.

Argued June 19, 1978.

Decided Aug. 28, 1978.

* Honorable Lawrence W. Pierce of the United States District Court for the Southern District of New York, sitting by designation.

Oakes, Circuit Judge, concurred and filed opinion.

Ira J. Dembrow, New York City, for petitioner-appellant.

Gerald J. Ryan, New York City, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of the State of New York; Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for respondent-appellee.

Before OAKES and VAN GRAAFEILAND, Circuit Judges, and PIERCE, District Judge.*

VAN GRAAFEILAND, Circuit Judge:

This is an appeal from an order of the United States District Court for the Eastern District of New York denying a petition for a writ of habeas corpus. We affirm.

In 1947, following a jury trial in New York Kings County Court, petitioner was convicted of robbing a coal company and sentenced to a term of thirty to sixty years as a second felony offender.[1] His convic-

1. Petitioner was originally sentenced as a third offender. However, because execution of sentence had been suspended following one of his

tion was affirmed by the Appellate Division. *People v. Bruno,* 273 App.Div. 977, 79 N.Y.S.2d 328 (2d Dep't 1948). This application for habeas corpus relief is the latest in a series of collateral attacks on the conviction,[2] which continue even though petitioner is now on parole. It is based upon an incident that occurred during his first trial which ended in a mistrial before any testimony was taken.

The State's principal witness was Vincent DiBari, the night watchman at the coal company, who identified petitioner as one of three men who accosted him at gunpoint, tied him up, and robbed the company safe. Prior to the first trial, DiBari received threats that he would be killed if he identified the robbers. Because he did not want to commit perjury, he refused to testify at all. It was this refusal which led, with petitioner's consent, to the mistrial.

■ Following the discharge of the jury, a colloquy took place between Justice Goldstein, presiding judge at the aborted trial, and DiBari, which is set forth in the margin.[3] It is petitioner's contention that the

---

prior convictions, that conviction could not serve as a basis for the establishment of third felony offender status. *See People v. Shaw,* 1 N.Y.2d 30, 150 N.Y.S.2d 161, 133 N.E.2d 681 (1956).

2. Petitioner made at least six applications for coram nobis relief in state court. He also filed a prior habeas corpus petition in federal court in which proceeding relief was ultimately denied by this Court. *See United States v. Herold,* 246 F.Supp. 363 (N.D.N.Y.1965), *rev'd,* 368 F.2d 187 (2d Cir. 1966), *opinion on remand,* 271 F.Supp. 491 (N.D.N.Y.1967), *rev'd,* 408 F.2d 125 (2d Cir. 1969), *cert. denied,* 397 U.S. 957, 90 S.Ct. 947, 25 L.Ed.2d 141 (1970).

3. The Court: Is there any application by the District Attorney at this time?

Mr. Helfand: Where is the witness?

The Court: He is right here. What is your application?

Mr. Helfand: The District Attorney moves that Your Honor commit this witness as a material witness in this case and hold him in default of $50,000.00 bail. We make this application to Your Honor in the light of the facts with which Your Honor is familiar, and particularly on the ground that this witness' life is in jeopardy and in serious danger that he would not be available to the District Attorney when he is needed, and we ask that he be committed, and that the bail be fixed in the sum of $50,000.00.

*By the Court*: (To Mr. DiBari)

Q. Mr. DiBari, how old are you? A. Thirty-eight.

Q. Are you married? A. Yes.

Q. Have you any children? A. Three.

Q. How long have you been working for this concern? A. Since 1931.

Q. What is the name of the concern that you are working for? A. Cirillo Brothers Ice, Coal and Fuel Corporation.

Q. How long have you been working for them? A. Since 1931.

Q. And you have been working there continuously? A. Well, no, I worked until 1943, and then I worked in the Navy Yard for three years, and I come back.

Q. They are one of the largest firms that we have in this city, is that correct, and they are reputable people too? A. The Cirillos?

Q. Yes? A. Yes, sir.

Q. You were the man that was held up in this case? A. That is right.

Q. You were the man that they tied up after they robbed the place? A. That is right.

Q. And you were the one that was approached after this weren't you, and your life threatened? A. That is right.

The Court: I am going to give you the protection that the Court thinks you are entitled to, and at the same time I also want to warn you that if you do not stick to the truth in this case, and tell exactly what happened, and what you told before the Grand Jury, with reference to these three notorious gunmen and robbers. If you want to take their place in this courtroom, and be a defendant, instead of these three notorious gunmen and robbers, that have records as long as your arm, I will give you that opportunity. I will hold you in $50,000.00 bail, and I am going to direct the District Attorney, when he puts you into custody, not to put you in Raymond Street jail, but some place else, and if any one attempts to come near you or to your home, I want you to notify the police; and for your own information, I will also tell you this, and for your peace of mind, that these three gunmen will be held in Queens County on another robbery case, where they shot a policeman and almost killed him, and they have got their identification there too, and if there is any more "fixing" to be done, at least in your own case, you ought to have your conscience clear, that you are going to come across and tell the truth here.

Mr. DiBari: I am telling the truth.

The Court: You owe that to the community to have these three notorious gunmen not let loose in our community.

Mr. DiBari: I did not get "fixed up" in this thing here.

court's admonition was so overreaching, it made his subsequent trial unfair, in violation of the due process clause of the Fourteenth Amendment. Although it might have been better if Justice Goldstein had been more circumspect in his choice of language, we agree with the district court that the state judge's comments did not so infect the subsequent trial, which took place before a different judge, as to deny petitioner due process.

> The Court: That is the reason I had to declare a mistrial here because of your attitude.
>
> Mr. DiBari: I told you before so I won't put you in any trouble or anybody else here. I don't want you to continue with a case where I know I will lie. I told you before I do not want to lie in a case.
>
> The Court: Your were frank enough to tell me your situation.
>
> Mr. Helfand: Except that I might point out to Your Honor that this witness will be told, when the case resumes for trial, whenever that is, if he wants to take the stand and lie, he will be confronted with his testimony before the Grand Jury, and if he admits in open court that he is lying, in that event we intend to indict him and prosecute him for perjury, as Your Honor has already indicated to him. Perhaps the time that he is in custody he can think this over.
>
> Mr. DiBari: I am telling you I am not going to testify. I don't care what you do with me.
>
> Mr. Helfand: That is what is going to happen.
>
> Mr. DiBari: I am not going to stick my head out and get bumped off.
>
> Mr. Helfand: You are the one that will be in jail.
>
> Mr. DiBari: Put me in jail. I know what I'm up against.
>
> Mr. Helfand: You have done enough talking. We will enter a formal order, Your Honor, committing this witness as a material witness.
>
> The Court: Where do you want him sent to?
>
> Mr. Helfand: I don't know whether the Tombs will take a material witness. Here, he is not in the prison proper. He will be in civil detention, which is under the Sheriff's jurisdiction.
>
> The Court: I will sign the order after it is submitted to me. Keep him out of Raymond Street anyhow. Will the Cirillo brothers please step up here?
>
> (Messrs. Frank Cirillo, Peter Cirillo and Constantino Cirillo appear before the Court.)
>
> The Court: You gentlemen have seen what has taken place here so far in this matter, where you are so vitally concerned in this

Justice Goldstein was confronted with a dilemma which every trial court encounters from time to time—the reluctance of a threatened witness to testify. *See United States v. Housand,* 550 F.2d 818, 825 (2d Cir.), *cert. denied,* 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977). He felt undoubtedly that it was incumbent upon him to admonish DiBari concerning his duty to testify truthfully, *id.* at 825, and to assure him that he would be protected from harm.

> matter. I wish you would try to talk to this gentleman, for his own good, and that he should stand by the People in this case and to tell the truth about it, because what happened to you people could happen to anybody in our community, and to have these three gunmen defy law and order in our community to this extent, would be a shameful situation. It is a pitiful situation. This is a direct stab at law and order in our community, after the police have done their duty and arrested these three gunmen, with the long records that they have, and if I can do anything in my power to keep them in jail, I will do so. There is no reason why they should not be convicted in this case, and if they go to trial and are acquitted because of this man's fear to tell the truth, would be a travesty upon justice. I am sure that you gentlemen will not tolerate anything of the kind. You men have been in business in our community and have fine reputations, and I will call upon all of you to help us out. This man has taken a very foolish stand here.
>
> If gunmen are going to run this town, the quicker the people of the community know it, the better. I will hold this man in $50,000.00 bail, and before any bail is produced, I want to have the application submitted to me before it is approved, because I think you ought to stay in jail until you are ready to testify. I will also give you this assurance; that I will see that the Police Commissioner gives you every police protection that is necessary for your safety. There is no reason why you should take the brunt of this thing because these three gunmen did tie you up, and then robbed the place, and then you come here and say you do not remember how they looked like.
>
> Mr. DiBari: That is what I told you beforehand. I know what trouble I am going to get into.
>
> The Court: I hope you will think it over.
>
> Mr. DiBari: I don't want to walk in fear on the street.
>
> The Court: I will give you plenty of time to think this over. Submit your order to me, Mr. Helfand, on this matter, and I will have him detained.

*See Piemonte v. United States,* 367 U.S. 556, 559 n. 2, 81 S.Ct. 1720, 6 L.Ed.2d 1028 (1961). That, in substance, is what Justice Goldstein attempted to do.

In weighing the possible prejudicial effect of an admonition against committing perjury, a court must consider the setting in which the incident takes place. If it occurs in the presence of a jury, it may have an effect on the jury as well as the witness, in that it may tend to indicate that the court does not believe, or will not believe, the witness. *See United States v. Reed,* 421 F.2d 190 (5th Cir. 1969) (*en banc*) (adopting dissenting opinion of Simpson, J., in *United States v. Reed,* 414 F.2d 435, 440 (5th Cir. 1969)). This possible side effect does not accompany a warning given in the jury's absence. In such a situation, an admonition against testifying falsely does not constitute improper intimidation or coercion of the witness to whom it is addressed. *United-ed States v. Jones,* 514 F.2d 648, 650 (5th Cir. 1975); *United States v. Stevenson,* 445 F.2d 25, 29 (7th Cir.), *cert. denied,* 404 U.S. 857, 92 S.Ct. 108, 30 L.Ed.2d 99 (1971); *United States v. Snyder,* 428 F.2d 520, 522 (9th Cir.), *cert. denied,* 400 U.S. 903, 91 S.Ct. 139, 27 L.Ed.2d 139 (1970); *United States v. Stayback,* 212 F.2d 313, 318 (3d Cir. 1954), *cert. denied,* 348 U.S. 911, 75 S.Ct. 289, 99 L.Ed. 714 (1955); *Pasqua v. United States,* 146 F.2d 522, 523 (5th Cir.), *cert. denied,* 325 U.S. 855, 65 S.Ct. 1183, 89 L.Ed. 1976 (1945); *Mooney v. United States,* 320 F.Supp. 316, 318 (E.D.Mo.1970). "Every witness is confronted with the standing 'threat' that he tell the truth or risk the possibility of a prosecution for perjury." *United States v. Stevenson, supra,* 445 F.2d at 29. This is a "coercion" established by law, 18 U.S.C. § 1621, not by the court. *United States v. Snyder, supra,* 428 F.2d at 522.

It is obvious that Justice Goldstein wanted DiBari to "come across and tell the truth," to "stick to the truth in this case, and tell exactly what happened." It is also quite clear that DiBari did not want to "stick [his] head out and get bumped off" and, if he testified, he would lie about his identification of the defendants. The only reasonable inference which can be drawn from DiBari's words is that his prior grand jury testimony concerning identification was truthful. In view of Justice Goldstein's insistence that DiBari tell the truth, we conclude that the judge's reference to Di-Bari's grand jury testimony did not unconstitutionally taint petitioner's subsequent trial before a different judge.

We likewise see no prejudicial taint resulting from Justice Goldstein's reference to the defendants' purported criminal records and tendencies. Because of the manner in which the robbery took place and the subsequent threats against DiBari's life, he hardly needed the judge's words to inform him that he was dealing with hardened criminals. As the district court found, Di-Bari needed no influence to convince him as to the facts. Once again, it is important to note that petitioner's trial took place before a different judge.[4]

Relying upon *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), respondent contends that petitioner's failure to raise the constitutional issue at his state trial bars him from seeking federal habeas corpus relief. Unfortunately, the record does not make clear whether petitioner and his attorney[5] were present in the courtroom when the conversation between Justice Goldstein and DiBari took place. When this habeas corpus petition was before this Court on a prior appeal, we remanded it to the district court by unpublished order to see whether the facts relative to waiver could be developed after a lapse of thirty years. Remand proved unfruitful, however, because counsel for both petitioner and respondent advised the district court that the individuals involved who were still available had no recollection of

---

4. If petitioner's argument concerning taint were carried to its logical extreme, Justice Goldstein's words *would preclude DiBari from testifying at any time before any judge.*

5. Petitioner's present attorney is not the one who represented him at his trial.

events other than what had already been presented to this Court.[6]

At a hearing held in connection with a prior unrelated habeas corpus application in 1967, the district attorney testified that he showed the minutes of the colloquy between Justice Goldstein and DiBari to the judge presiding at petitioner's second trial, at a bench conference with petitioner's counsel present, just prior to calling DiBari as a witness. *See United States v. Herold, supra,* 271 F.Supp. at 494. Petitioner's former attorney testified at the same hearing that the disclosure may have happened in the judge's robing room or at the bench, with the jury excused. *Id.* at 495. The court below found that there was at least a "permissible inference" that petitioner's former attorney knew what Justice Goldstein had said. We agree. However, because we conclude that Justice Goldstein's comments did not deprive petitioner of a fair trial, we need not reach the issue of waiver.

The order appealed from is affirmed.

OAKES, Circuit Judge (concurring):

I wish to concur in Judge Van Graafeiland's opinion. I do so only because there was evidence the witness had been threatened and had refused to testify out of fear. Moreover, as Judge Van Graafeiland points out, the subsequent trial was before a different judge, thus mitigating the impact of Justice Goldstein's strong language. And I want to make it clear that if the judge had admonished the witness against perjurious testimony in the presence of the jury his conduct would clearly have amounted to a violation of due process.

I reach the result with some doubt, having in mind, *e. g., Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (threats of perjury charges and intimidation by trial judge against defendant's only wit-

ness deprived defendant of right to call witnesses in his own behalf); *United States v. Reed,* 421 F.2d 190 (5th Cir.) (en banc) (court's admonitions to defendant and his witness regarding perjury deprived him of fair trial), *reversing United States v. Reed,* 414 F.2d 435 (5th Cir. 1969). And, obviously, if the judge had made the remarks before the jury, they would have been prejudicial. *See Starr v. United States,* 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841 (1894). But here they were made after the witness had been threatened so that they had a measure of justification. And while the judge making them also exposed—improperly, I feel—his view of the defendants' guilt, this alone could hardly have been determinative of the witness's ultimate testimony: either he could identify the robbers or he could not.

---

**6.** In a letter to this Court dated June 27, 1977, petitioner's present counsel stated that it was petitioner's recollection that he and his former counsel were in the courtroom when Justice Goldstein spoke to DiBari but that only the district attorney was up front with the judge and the witness. By letter from respondent's counsel dated June 28, 1977, we were advised that petitioner's former counsel could not recall whether he was present during the colloquy between Justice Goldstein and DiBari.